## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **FRANK SANTICHEN,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) **Civil Action No. 06-72J** |
| **v.** | ) |
| | ) **JUDGE GIBSON** |
| **GREATER JOHNSTOWN WATER** | ) |
| **AUTHORITY and** | ) |
| **RDM-JOHNSTOWN, LLC.,** | ) |
| | ) |
| **Defendants.** | ) |

## MEMORANDUM OPINION AND ORDER OF COURT

**GIBSON, J.**

### I. SYNOPSIS

This matter comes before the Court on Motions for Summary Judgment filed by Defendant RDM-Johnstown, LLC ("RDM"), and Defendant Greater Johnstown Water Authority ("Water Authority").¹ Document Nos. 46 & 50. For the reasons that follow, these Motions for Summary Judgment will be granted.

### II. BACKGROUND

Between 1964 and February 17, 2005, Laurel Management Company ("Laurel") was a party to an agreement with the Water Authority whereby Laurel would manage and maintain the water system in the Greater Johnstown area. Document Nos. 47, 52, 55 & 59, ¶ 1. This contract was typically renewed every few years. Document Nos. 52 & 55, ¶ 2. Although a collective bargaining agreement was in effect between Laurel and its employees, the Water Authority was not a party to it.

---

¹ The Court infers from the record that the letters "RDM" stand for Resource Development & Management, Inc. Document No. 49, p. 5.

1

*Id.*, ¶ 3.

Plaintiff Frank J. Santichen ("Santichen") began working for Laurel in 1977. Document Nos. 52 & 55, ¶ 7. He remained employed by Laurel through February 2005, making his employment span a period of over twenty-seven years. *Id.* Santichen was originally hired by Bill Cvrkel ("Cvrkel"), who was Laurel's General Manager in 1977. *Id.* at ¶ 8. At that time, Laurel's contract with the Water Authority was already in place. *Id.* Throughout his employment with Laurel, Santichen believed that Cvrkel had the authority to fire him. *Id.*

Santichen spent the overwhelming majority of his time at Laurel working pursuant to the contract with the Water Authority, although he occasionally worked pursuant to other contracts to which Laurel was a party. *Id.*, ¶ 9. On a usual day, Santichen would drive his own vehicle to Laurel's offices, and then take one of Laurel's vehicles to the job site. *Id.*, ¶ 10. The Laurel vehicles had the words "Laurel Management Company" written on them. *Id.* Before returning home at the end of a workday, Santichen would return to Laurel's offices and retrieve his personal vehicle. *Id.* His immediate supervisor was Ronald Felix ("Felix"), who was a Laurel employee. *Id.*, ¶ 11. Santichen typically received his daily work assignments each morning from either Felix or Cvrkel. *Id.* From 2000 through 2005, Santichen worked as a construction crew leader. *Id.*, ¶ 12. His duties included pipe work, concrete work, carpentry work and plumbing work. *Id.* Prior to becoming a construction crew leader, Santichen had worked as a laborer in the construction crew for a period of sixteen years. *Id.* Laurel generally had three to four different construction crews working on a given day. *Id.*, ¶ 13. Felix supervised all of the construction crews. *Id.* He made job assignments each morning, and he returned to the sites of particular jobs whenever problems arose. *Id.*

Santichen was compensated by Laurel on a biweekly basis. *Id.*, ¶ 14. Laurel determined his

2

rate of pay, while Felix and Cvrkel determined his work schedule. *Id.*, ¶ 15. Laurel provided Santichen with the tools that he needed, including hand tools and a jackhammer. *Id.*, ¶ 16. Laurel also provided Santichen with safety equipment, including a hardhat, earmuffs, gloves and eye protection. *Id.* Safety cones, barricades and caution tape were provided for street jobs. *Id.* Laurel gave Santichen copies of its policies concerning safety, harassment, drugs, alcohol and vacation. *Id.*, ¶ 17. When Santichen needed to attend training seminars, Laurel paid for his travel expenses. *Id.*

While he was working, Santichen wore a uniform that was provided by Laurel. *Id.*, ¶ 18. Laurel provided cleaning services for this uniform. *Id.* The uniform included a patch displaying the words "Greater Johnstown Management Company" and "Laurel Management Company." *Id.* Nevertheless, the Water Authority never supervised Santichen's work, determined his rate of pay, assigned his job duties, provided him with transportation, or evaluated his performance. *Id.*, ¶¶ 19-25.

Between 2001 and 2003, three individuals complained about Santichen's conduct. *Id.*, ¶ 40. On two occasions, he was accused of making "advances" toward females with whom he had come into contact during work hours. *Id.* He received a verbal reprimand from Laurel after the second such incident. *Id.* The third complaint involved an allegation that Santichen had made "advances" toward a female janitor. *Id.*, ¶ 41. Laurel apparently suspended Santichen for a day without pay after learning of this third incident. *Id.*, ¶ 43. Santichen wrote a letter to the janitor apologizing for making her feel uneasy. *Id.*, ¶ 42. In that letter, he indicated that he would not work during evening hours (when the female janitor worked) because he did not want her to feel uncomfortable. *Id.* Santichen admits that these complaints were lodged against him, and that discipline was imposed for the third incident, but he maintains that he did nothing wrong. Document No. 59, ¶ 10.

Sometime near the beginning of this decade, the Water Authority decided to solicit new bids

3

for the management and maintenance of its water system. Document Nos. 52 & 55, ¶ 4. Members of the Water Authority's board of directors apparently believed that they could get a better contract than the one which had been in place with Laurel. *Id.* Laurel, RDM and American Waterworks each submitted bids for the new contract with the Water Authority. *Id.*, ¶ 5. The contract was awarded to RDM in 2003 because RDM had submitted the lowest bid. *Id.*, ¶ 6. The Water Authority and RDM entered into a management services contract on February 27, 2003, which anticipated that RDM would begin to provide services on February 18, 2005. Document Nos. 47 & 59, ¶ 2. This contract required RDM to hire qualified employees who had experience working on the Greater Johnstown water system. Doc. Nos. 47 & 59, ¶ 3. In accordance with this obligation, RDM began to solicit applications from Laurel's employees. *Id.*, ¶ 4. During the middle part of 2003, RDM hired Felix, David DiNicola ("DiNicola"), Michael Kukura ("Kukura") and Jeffrey Smith ("Smith") as managers. *Id.*, ¶ 6. Shortly thereafter, RDM began the process of filling vacancies for service and labor employees. *Id.*, ¶ 7. Christopher Kerr ("Kerr"), RDM's Vice-President of Operations, was responsible for making these hiring decisions. *Id.* The managers apparently had some input as to whether a particular individual was hired. *Id.*

Although Santichen has not seen the contract between the Water Authority and RDM, he knows that it did not include a provision requiring RDM to hire all Laurel employees who had been working to maintain the Greater Johnstown water system pursuant to Laurel's prior contract with the Water Authority. Document Nos. 52 & 55, ¶ 27. He was never led to believe that RDM would have jobs available for all Laurel employees seeking employment pursuant to the new contract. *Id.*, ¶ 28. Kerr sent a letter to all Laurel employees stating that those seeking jobs with RDM had to submit applications. *Id.*, ¶ 29.

4

Santichen applied for a position with RDM on September 26, 2003. Document Nos. 47 & 59, ¶ 8. Kerr interviewed Santichen for a position, asking him about the nature of his work while employed by Laurel. Document Nos. 52 & 55, ¶ 31. Santichen was interviewed by Kerr again in August 2004. *Id.*, ¶ 32. No Water Authority personnel were present during these interviews. *Id.*, ¶ 33. At the time of his second interview, Santichen was forty-five years old. *Id.*, ¶ 35. On that occasion, Kerr told Santichen that, due to financial constraints, RDM could not offer him a position. *Id.*, ¶ 34. Santichen is aware of four Laurel employees under the age of forty and eight Laurel employees over the age of forty who were hired by RDM. *Id.*, ¶ 36. Santichen's employment with Laurel apparently ended on February 17, 2005, as a consequence of Laurel's loss of its contract with the Water Authority. Document No. 11-3, pp. 2-3. The Water Authority played no role in the decision to terminate his employment with Laurel. Document Nos. 52 & 55, ¶ 38. There were four other applicants from Laurel who were not hired by RDM. Document Nos. 47 & 59, ¶ 11.

On June 15, 2005, Santichen filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that RDM had violated the Age Discrimination in Employment Act ("ADEA") [29 U.S.C. § 621 *et seq.*] by failing to hire him on account of his age. Document No. 8-2, pp. 1-4. Santichen commenced this action against Laurel, the Water Authority and RDM on March 29, 2006. Document No. 1. Given that more than sixty days had passed since the filing of his EEOC charge, Santichen was entitled to file a suit pursuant to 29 U.S.C. § 626(c). 29 U.S.C. § 626(d). The parties stipulated to the dismissal of Laurel as a party on February 7, 2007, and the Court signed an order adopting the stipulation nine days later. Document Nos. 24 & 25. Consequently, Laurel was removed as a party in this case.

RDM filed a Motion for Summary Judgment on July 13, 2007, arguing that its decision not to

hire Santichen had not constituted a violation of the ADEA. Document Nos. 46 & 48. Three days later,

the Water Authority filed a Motion for Summary Judgment, contending that it was not Santichen's

"employer" within the meaning of the ADEA. Document Nos. 50 & 51. These motions are currently

pending before the Court and, hence, are the subject of this memorandum opinion.

## III. SUMMARY JUDGMENT STANDARDS

> Summary judgment is appropriate only when it is demonstrated that there is no genuine
> issue as to any material fact and the moving party is entitled to judgment as a matter of
> law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-32, 106 S.Ct. 2548, 2552-57, 91
> L.Ed.2d 265, 273-280 (1986); Fed.R.Civ.P. 56(c). An issue of material fact is genuine
> 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving
> party.' *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91
> L.Ed.2d 202, 211-212 (1986). In deciding a motion for summary judgment, all
> reasonable inferences must be drawn in favor of the non-movant. *Oritani [Sav. And
> Loan Ass'n v. Fidelity and Deposit Co.*, 989 F.2d 635, 638 (3d Cir. 1993)]."

*Troy Chemical Corp. v. Teamsters Union Local No. 408*, 37 F.3d 123, 125-126 (3d Cir. 1994).

> As to materiality, the substantive law will identify which facts are material. Only
> disputes over facts that might affect the outcome of the suit under the governing law
> will properly preclude the entry of summary judgment. Factual disputes that are
> irrelevant or unnecessary will not be counted. See generally 10A C. Wright, A. Miller,
> & M. Kane, Federal Practice and Procedure § 2725, pp. 93-95 (1983). This materiality
> inquiry is independent of and separate from the question of the incorporation of the
> evidentiary standard into the summary judgment determination. That is, while the
> materiality determination rests on the substantive law, it is the substantive law's
> identification of which facts are critical and which facts are irrelevant that governs.
> Any proof or evidentiary requirements imposed by the substantive law are not germane
> to this inquiry, since materiality is only a criterion for categorizing factual disputes in
> their relation to the legal elements of the claim and not a criterion for evaluating the
> evidentiary underpinnings of those disputes.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986).

## IV. JURISDICTION AND VENUE

The Court has jurisdiction in this case pursuant to 28 U.S.C. § 1331. Venue is proper under 28

6

U.S.C. § 1391(b).

## V. DISCUSSION

Before proceeding to the factual circumstances related to Santichen's claims, the Court must

take note of a few preliminary points. The ADEA defines an "employer" as "a person engaged in an

industry affecting commerce who has twenty or more employees for each working day in each of

twenty or more calendar weeks in the current of preceding calendar year[,]" including "a State or

political subdivision of a State and any agency or instrumentality of a State or a political subdivision

of a State[.]" 29 U.S.C. § 630(b). The relevant language in the ADEA provides:

### § 623. Prohibition of age discrimination
**(a) Employer practices.** It shall be unlawful for an employer--

(1) to fail or refuse to hire or to discharge any individual or otherwise
discriminate against any individual with respect to his compensation, terms,
conditions, or privileges of employment, because of such individual's age;
(2) to limit, segregate, or classify his employees in any way which would
deprive or tend to deprive any individual of employment opportunities or
otherwise adversely affect his status as an employee, because of such
individual's age; or

(3) to reduce the wage rate of any employee in order to comply with this Act.

29 U.S.C. § 623(a)(1)-(3). The plain language of the ADEA makes it clear that the prohibitions

contained therein are "limited to individuals who are at least 40 years of age." 29 U.S.C. § 631(a).

Since this is a federal employment discrimination case in which no direct evidence of

discrimination is presented, the United States Supreme Court's analyses in *McDonnell Douglas Corp.*

*v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Department of Community*

*Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), provide the formulation for

allocating the requisite burdens of proof and production for purposes of the pending motions for

7

summary judgment.[2] Generally speaking, a plaintiff who has no direct evidence of discrimination must establish a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802-803, 93 S.Ct. at 1824-1825, 36 L.Ed.2d at 677-678. If a prima facie case is established, the defendant must then articulate a legitimate, nondiscriminatory reason for treating the plaintiff in an adverse manner. *Id.* If the defendant articulates a legitimate, nondiscriminatory reason for the adverse treatment, the plaintiff can defeat a motion for summary judgment by pointing to some evidence from which a rational finder of fact could reasonably either disbelieve the employer's articulated explanation or "believe that an invidious discriminatory reason was more likely than not a [] determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). The plaintiff "may succeed in this either directly by persuading the court [for purposes of summary judgment] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095, 67 L.Ed.2d at 217.

The *McDonnell Douglas/Burdine* framework does not apply in cases in which direct evidence of discrimination is presented. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511, 122 S.Ct. 992, 997, 152 L.Ed.2d 1, 9 (2002). Direct evidence of discrimination is evidence that is "so revealing of discriminatory animus that it is not necessary to rely on any presumption from the *prima facie* case to shift the burden of production." *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1096, n. 4 (3d Cir. 1995). In such cases, there is no need for an *inference* of discrimination, since the discrimination

---

[2] The Supreme Court has not held that the *McDonnell Douglas/Burdine* framework is applicable to ADEA cases. Instead, it has assumed *arguendo* that the *McDonnell Douglas/Burdine* framework applies in this context. *Smith v. City of Jackson*, 544 U.S. 228, 252, 125 S.Ct. 1536, 1551, 161 L.Ed.2d 410, 429 (2005)(O'Connor, J., concurring in the judgment); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097, 2105, 147 L.Ed.2d 105, 116 (2000); *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 311, 116 S.Ct. 1307, 1309-1310, 134 L.Ed.2d 433, 438 (1996). The United States Court of Appeals for the Third Circuit, however, has held that the *McDonnell Douglas/Burdine* burden-shifting framework applies in ADEA cases that do not involve direct evidence of age discrimination. *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997)(*en banc*).

8

is readily apparent. Where the *McDonnell Douglas/Burdine* framework does apply, "the precise elements of a prima facie case can vary depending on the context and were 'never intended to be rigid, mechanized, or ritualistic.'" *Swierkiewicz*, 534 U.S. at 512, 122 S.Ct. at 997, 152 L.Ed.2d at 9, quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957, 967 (1978). In *Jones v. School District of Philadelphia*, 198 F.3d 403, 411 (3d Cir. 1999), the United States Court of Appeals for the Third Circuit explained that "the elements of a *prima facie* case depend on the facts of the particular case[,]" and that "a *prima facie* case cannot be established on a one-size-fits-all basis." Thus, "the *prima facie* test remains flexible and must be tailored to fit the specific context in which it is applied." *Sarullo v. United States Postal Service*, 352 F.3d 789, 797-798 (3d Cir. 2003).

In *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996), the Supreme Court held that the statutory language limiting the ADEA's protections to those who have attained the age of forty is relevant for no purpose other than determining whether a plaintiff is within the class of persons entitled to statutory protection. *O'Connor*, 517 U.S. at 313, 116 S.Ct. at 1310, 134 L.Ed.2d at 439 ("Because the ADEA prohibits discrimination on the basis of age and not class membership, the fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class."). The Supreme Court explained the relationship between the substantive provisions of the ADEA and 29 U.S.C. § 631(a)'s delineation of the protected class as those who have reached the age of forty:

The discrimination prohibited by the ADEA is discrimination "because of [an] individual's age," 29 U.S.C. § 623(a)(1), though the prohibition is "limited to individuals who are at least 40 years of age," § 631(a). This language does not ban discrimination against employees because they are aged 40 or older; it bans discrimination against employees because of their age, but limits the protected class to those who are 40 or older. The fact that one person in the protected class has lost out

9

to another person in the protected class is thus irrelevant, so long as he has lost out *because of his age*. Or to put the point more concretely, there can be no greater inference of *age* discrimination (as opposed to "40 or over" discrimination) when a 40-year-old is replaced by a 39-year-old than when a 56-year-old is replaced by a 40-year-old. Because it lacks probative value, the fact that an ADEA plaintiff was replaced by someone outside the protected class is not a proper element of the *McDonnell Douglas* prima facie case.

*O'Connor*, 517 U.S. at 312, 116 S.Ct. at 1310, 134 L.Ed.2d at 438 (emphasis in original).

Notwithstanding the ADEA's prohibition of discrimination *based on age*, however, the prohibitions contained therein only apply in one direction (*i.e.*, prohibiting discrimination which favors the young and disfavors the old, but *not* prohibiting discrimination which favors the old and disfavors the young). In *General Dynamics Land Systems, Inc. v. Cline*, 540 U.S. 581, 124 S.Ct. 1236, 157 L.Ed.2d 1094 (2004), the Supreme Court held that the ADEA does not prohibit discrimination against younger individuals. The Supreme Court explained that, within the context of 29 U.S.C. § 623(a)(1), the words "because of such individual's age" essentially mean "because of such individual's [old or advanced] age." *General Dynamics*, 540 U.S. at 594-600, 124 S.Ct. at 1245-1249, 157 L.Ed.2d at 1109-1113. Assuming that the plaintiff in a given case is within the class of persons protected under the ADEA (*i.e.*, someone who has attained the age of forty) and is alleging that the defendant took an adverse employment action against him or her because of his or her advanced age, the dispositive question is whether the plaintiff's age "actually motivated" the defendant's adverse employment decision. *Glanzman v. Metropolitan Management Corp.*, 391 F.3d 506, 512 (3d Cir. 2004). In this context, age can be said to have "actually motivated" the defendant's decision if it played a role in the decisionmaking process and "had a determinative influence on the outcome." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 141, 120 S.Ct. 2097, 2105, 147 L.Ed.2d 105, 116 (2000).

## A. The Water Authority's Motion for Summary Judgment

In support of their Motions for Summary Judgment, the Defendants both argue that the decision not to hire Santichen was made for reasons other than his age. In addition, the Water Authority argues that it was neither Santichen's employer nor his prospective employer, but rather an entity under contract with his employer (Laurel) and, later, with his prospective employer (RDM). Document No. 51, pp. 5-12. What the Water Authority's argument essentially boils down to is an argument that it is not an "employer" within the meaning of the ADEA.

The ADEA defines the term "employer" as "a person engaged in an industry affecting commerce who has twenty or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year[,]" including "a State or political subdivision of a State and any agency or instrumentality of a State or a political subdivision of a State[.]" 29 U.S.C. § 630(b). In this context, the word "person" means "one or more individuals, partnerships, associations, labor organizations, corporations, business trusts, legal representatives, or any organized groups of persons." 29 U.S.C. § 630(a). The parties do not appear to dispute that the Water Authority is a "person." Nonetheless, they clearly disagree as to whether it is an "employer."

As a general matter, "the precise contours of an employment relationship can only be established by a careful factual inquiry." *Graves v. Lowery*, 117 F.3d 723, 729 (3d Cir. 1997). In *National Labor Relations Board v. Browning-Ferris Industries of Pennsylvania*, 691 F.2d 1117 (3d Cir. 1982), the Court of Appeals for the Third Circuit made a distinction between a "single employer" relationship and a "joint employer" relationship. "A 'single employer' relationship exists where two nominally separate entities are actually part of a single integrated enterprise so that, for all purposes, there is in fact only a 'single employer.'" *Browning-Ferris*, 691 F.2d at 1122. In such a situation, the

11

relevant question is "whether the two nominally independent enterprises, in reality, constitute only *one integrated enterprise*." *Id.* (emphasis in original).

In contrast, a finding that two entities are "joint employers" assumes that they are what they appear to be (i.e., separate entities). *Id.* A finding that two entities are joint employers "recognizes that the business entities involved are in fact separate but that they *share* or co-determine those matters governing the essential terms and conditions of employment." *Id.* at 1123 (emphasis in original). The basis for such a finding is that one employer, while contracting in good faith with a distinct entity, "has retained for itself sufficient control of the terms and conditions of employment" of the individuals who are employed by that entity. *Id.* In this case, no party asserts that the Water Authority is essentially the same entity as RDM (or that it was the same entity as Laurel). Consequently, the dispositive question is whether the Water Authority and RDM can be fairly characterized as "joint employers" for purposes of this case.

There are different tests employed by courts for determining whether an individual is an employee of a given entity. One such test is derived from the following passage in the Supreme Court's decision in *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989):

In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party. No one of these factors is determinative.

12

*Reid*, 490 U.S. at 751-752, 109 S.Ct. at 2178-2179, 104 L.Ed.2d at 831-832 (internal citation and footnotes omitted). In *Walters v. Metropolitan Educational Enterprises, Inc.*, 519 U.S. 202, 211, 117 S.Ct. 660, 666, 136 L.Ed.2d 644, 654 (1997), the Supreme Court indicated that this thirteen-factor inquiry provided the applicable framework for determining whether an entity employed a sufficient number of employees to constitute an "employer" within the meaning of Title VII of the Civil Rights Act of 1964 ("Title VII") [42 U.S.C. § 2000e *et seq.*].[3]

Last year, in *Butterbaugh v. Chertoff*, 479 F.Supp.2d 485, 492 (W.D.Pa. 2007), this Court noted that the "central question" of whether an entity is a "joint employer" under *Browning-Ferris* is virtually identical to the question of whether such an entity constitutes an "employer" under the factors enumerated in *Reid*, even though different factors may guide the analysis. In determining whether an entity (such as the Water Authority in this case) is a joint employer under *Browning-Ferris*, a court must consider the following factors: (1) "authority to hire and fire employees, promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours;" (2) "day-to-day supervision of employees, including employee discipline;" and (3) "control of employee records, including payroll, insurance, taxes and the like." *Butterbaugh*, 479 F.Supp.2d at 491. The Court of Appeals for the Third Circuit has not explained the circumstances in which the more generalized "joint employer" test should be used instead of the thirteen-factor *Reid* test. *Wilson v. MVM, Inc.*, 475 F.3d 166, 172-173 (3d Cir. 2007) (declining to address the question on the ground that its resolution was unnecessary in the case at issue).

In *Butterbaugh*, this Court opined that while the *Reid* test provides the applicable framework

---

[3] Title VII defines the term "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person . . ." 42 U.S.C. § 2000e(b).

13

for determining whether an employer meets Title VII's employee-numerosity requirement, the *Browning-Ferris* analysis may be the appropriate framework for determining whether a particular individual is an "employee" of an entity that is concededly an "employer" within the meaning of Title VII. *Butterbaugh*, 479 F.Supp.2d at 492-494. In so observing, the Court noted that a defense based on Title VII's employee-numerosity requirement "indicates that a particular lawsuit threatens to expand Title VII beyond its congressional design" (i.e., by imposing obligations on, and extending liability to, entities not intended to be covered under the statute), whereas a defense based on a lack of an employment relationship between the defendant and the plaintiff may undermine Title VII's broad remedial purpose (*i.e.*, by depriving individuals of statutory protection from discrimination perpetrated by entities clearly covered by Title VII). *Id.* at 492-493. Title VII, of course, defines the term "employee" simply as "an individual employed by an employer . . ." 42 U.S.C. § 2000e(f).

At the outset, the Court notes that the applicable definitions contained in the ADEA are not materially different from those contained in Title VII. The ADEA defines the term "employee" as "an individual employed by any employer . . ." 29 U.S.C. § 630(f).[4] Although the employee-numerosity requirements of these two statutes differ, they differ only in the number of employees needed for an entity to constitute a covered "employer."[5] Therefore, the Court's analysis of the applicable Title VII provisions in *Butterbaugh* guides the analysis of the applicable ADEA provisions in this case. The application of this analysis in the instant case, however, is somewhat problematic because the Water

---

[4] The ADEA's definition of the term "employee," like Title VII's definition of that same term, includes exceptions to the general definition which are not relevant to the Court's analysis in this case. 29 U.S.C. § 630(f); 42 U.S.C. § 2000e(f).

[5] Title VII defines the term "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person . . ." 42 U.S.C. § 2000e(b). The ADEA's definition is similar, but it includes only entities which employ twenty (rather than fifteen) or more individuals. 29 U.S.C. § 630(b).

14

Authority appears to base its argument on *both* the ADEA's employee-numerosity requirement *and* its "employment" relationship (or lack thereof) with Santichen. The Court has before it an affidavit completed by Edward Cernic ("Cernic"), the Chairman of the Water Authority, stating that the Water Authority only employed three individuals during the period of time in question. Document No. 52-2, p. 51. The Court is convinced that the ADEA's employee-numerosity requirement, like that contained in Title VII, is properly characterized as "an element of a plaintiff's claim for relief," thereby requiring Santichen to establish that the Water Authority is an "employer" within the meaning of the ADEA. *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 516, 126 S.Ct. 1235, 1245, 163 L.Ed.2d 1097, 1110-1111 (2006). In determining whether an individual counts as one of the twenty "employees" needed to satisfy the ADEA's employee-numerosity requirement, a court must apply the thirteen-factor test discussed in *Reid. Walters*, 519 U.S. at 211-212, 117 S.Ct. at 666, 136 L.Ed.2d at 654, citing *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323-324, 117 L.Ed.2d 581, 112 S.Ct. 1344 (1992); *Butterbaugh*, 479 F.Supp.2d at 492 ("Thus, when the question is not whether the defendant employed the plaintiff, but whether the defendant employed a sufficient number of other people to meet the requirements of subsection (b), the more scrutinous thirteen-factor test governs."). Nevertheless, in this case, the Water Authority also argues that Santichen was never an employee (or prospective employee) of the Water Authority (*i.e.*, that Santichen was never *employed by* the Water Authority for purposes of 29 U.S.C. § 630(f)). In *Butterbaugh*, the Court concluded that this latter inquiry was to be conducted in accordance with the "less rigid" *Browning-Ferris* analysis. *Butterbaugh*, 479 F.Supp.2d at 493. Perhaps that is why the Water Authority places significant reliance on the factors identified in *Butterbaugh* as being relevant to the "joint employer" inquiry. Document No. 51, pp. 5-12.

In his brief, Santichen does not specifically argue that the Water Authority employed twenty

15

or more individuals *aside* from those working pursuant to the contract with RDM (or with Laurel). Document No. 54, p. 8. He has presented no evidence to establish that the Water Authority is, in fact, an "employer" for purposes of the ADEA independent of its contract with RDM. Thus, in order to establish that RDM's employees count as "employees" of the Water Authority for purposes of the ADEA's employee-numerosity requirement, Santichen must show that twenty or more of those individuals are "employees" of the Water Authority in accordance with the thirteen-factor *Reid* test. *See Walters*, 519 U.S. at 211-212, 117 S.Ct. at 666, 136 L.Ed.2d at 654. In order to establish his own status as an employee of the Water Authority during the period of his employment with Laurel (and his status as a prospective employee of the Water Authority when he applied for a job with RDM), Santichen must show that he was jointly employed (or would have been jointly employed) by the Water Authority in accordance with the more generalized *Browning-Ferris* test. *Butterbaugh*, 479 F.Supp.2d at 492-493. These two tests, of course, overlap to a considerable degree. *Id.* at 493-494. For that reason, the Court will conduct these analyses simultaneously.

The Court has before it portions of the agreement that the Water Authority entered into with RDM on February 27, 2003. Document No. 49, pp. 5-7. The relevant language in the agreement provides:

D.    The Manager shall seek to obtain qualified employees who have experience working on the Greater Johnstown Water System. Failure to make reasonable efforts to employ such persons shall be grounds for termination of this agreement pursuant to Article XIII. Tentative employment decisions must be submitted to the GJWA so that the Authority can monitor compliance of this requirement.

E.    The Manager shall provide the services of a resident manager who is satisfactory to the GJWA.

F.    The Manager shall provide to the Authority an organizational chart showing all employees with responsibilities for the Authority operation and update the same

16

when changes are made.

*Id.*, p. 7. The plain language of the agreement suggests that while RDM was required to hire individuals who had worked on the Water Authority's water system (which presumably meant those who had worked on the system pursuant to the prior contract with Laurel), RDM was given independent authority to make its own personnel decisions. Although the Water Authority reserved the right to monitor RDM's personnel decisions for the purpose of ensuring that the people working on its system had the requisite experience, it did not reserve the right to direct the hiring (or dismissal) of a particular employee. The Water Authority apparently had to agree only as to who was chosen as the resident manager.

In his deposition, Kerr testified that the Water Authority had to agree as to who was hired as the resident manager, but that all other personnel decisions were made by RDM. Document No. 56-2, pp. 23-24. Kerr's testimony is consistent with that of Cernic, who testified that the agreement did not include a requirement that all Laurel employees working on the water system be retained by RDM. Document No. 52-2, p. 28. He indicated that while the Water Authority had hoped that RDM would retain as many Laurel employees as possible, there was an understanding that some such employees might not be retained because of a need to cut costs. *Id.* After all, the Water Authority sought new bids precisely because it did not want to continue paying the amount of money needed to satisfy the demands of the agreement with Laurel. *Id.*

The parties agree that while the majority of Santichen's time as a Laurel employee was spent working on the water system, he sometimes performed work pursuant to other contracts to which Laurel was a party. Document Nos. 52 & 55, ¶ 9. He received his daily assignments from either Felix or Cvrkel, both of whom worked for Laurel. *Id.*, ¶ 11. Laurel determined Santichen's rate of pay,

17

provided him with the proper equipment for doing his job, gave him copies of its work-related policies, and paid his travel expenses when he needed to attend training seminars. *Id.*, ¶¶ 14-17. Santichen testified that, while working for Laurel, he had worn a patch displaying the words "Greater Johnstown Management Company" and "Laurel Management Company." Document No. 52-2, p. 8. Nevertheless, his own testimony appears to support the Water Authority's assertion that any indication that Laurel employees were employed by the Water Authority had more to do with public perceptions than it had to do with practical realities. Santichen testified as follows:

Q.   What facts do you have to support any contention that you were employed by the Water Authority from 1977 through February of 2005?

A.   Other than the patch, none.

Q.   Okay.

A.   And can I add to that, though?

Q.   Sure.

A.   And most people in the City of Johnstown thinking that we worked for the Greater Johnstown Water Authority.

Q.   How was that?

A.   Everywhere you went, you represented yourself as working for the Greater Johnstown Water Authority. They still do to this day. And when everybody asks you, they say, oh, you work for the Water Authority, and that's usually the way it is 90 percent of the time.

Q.   But you nevertheless–you believed that you were employed by the Laurel–by Laurel Management?

A.   Right.

Q.   Is that correct?

A.   Correct.

18

Q. And it's also fair to state that Laurel had a contract with the Greater Johnstown Water Authority; is that correct?

A. Correct.

Q. And that contract was for Laurel to manage and maintain the Water Authority; is that correct?

A. Correct. The water system, yes.

Q. All right. Are you aware of anything else that that contract provided for?

A. Just for safe water, I guess. Standards.

Q. Did you as an employee of Laurel, did you do any other work other than Greater Johnstown Water Authority work?

A. Some.

Q. Who else did you do work for?

A. Laurel, their private side.

Q. Laurel Management you're talking about?

A. Yeah.

Q. All right. What type of work did you do for their private side, as you referred to it?

A. Sometimes their private contract sides. We did jobs for wherever they got work.

*Id.*, p. 10. In light of this testimony, it is clear that Santichen viewed himself as an employee of Laurel rather than as an employee of the Water Authority. The mere fact that his continued employment with Laurel was dependent upon Laurel's contract with the Water Authority did not transform the Water Authority into his employer.

Given the evidence of record, it is clear that Laurel (and, after the commencement of the new agreement, RDM) retained the "authority to hire and fire employees, promulgate work rules and

19

assignments, and set conditions of employment, including compensation, benefits, and hours[.]" *Butterbaugh*, 479 F.Supp.2d at 494. Although Santichen testified that the Water Authority sometimes sought to hold Laurel employees directly accountable for their work-related mistakes, he acknowledged that the Water Authority did not determine his work hours or day-to-day assignments. Document No. 52-2, p. 7. The Water Authority did not retain control of the terms of Santichen's employment, since he sometimes performed work for Laurel that was unrelated to the contract with the Water Authority. The evidence also indicates that while the Water Authority insisted that RDM hire experienced employees to work on the water system, it did not directly participate in the personnel decisions made by RDM. Under these circumstances, it is clear that no reasonable jury could conclude that Santichen was an "employee" (or a prospective "employee") of the Water Authority.

As noted earlier, the broad remedial purpose of the ADEA counsels in favor of a broad construction of the term "employee." *Butterbaugh*, 479 F.Supp.2d at 492-493. In contrast, a broad construction of the term "employer" (within the context of the ADEA's employee-numerosity requirement) would extend the ADEA's application to entities not contemplated by Congress as entities subject to that statute's substantive provisions. *Id.* at 492. It is for this reason that the more stringent *Reid* test applies in cases involving the employee-numerosity requirement. *Id.* In this case, Santichen seeks to satisfy the employee-numerosity requirement by establishing that the employees of RDM (or Laurel) count as "employees" of the Water Authority. The Court has already concluded that, under *Browning-Ferris*, Santichen cannot establish that such employees are (or were) "employees" of the Water Authority within the meaning of the ADEA. It follows *a fortiori* that he cannot establish that the Water Authority employed twenty or more individuals at any time relevant to this case.

Accordingly, the Court must grant the Water Authority's Motion for Summary Judgment.[6] Document No. 50.

## B. RDM's Motion for Summary Judgment

In order for Santichen to establish a prima facie case of age discrimination under the ADEA, he must show that: (1) he was in the class of persons protected under the statute (i.e., he was "at least 40 years of age"; (2) he was qualified for the position at issue; (3) he suffered an adverse employment action (*i.e.*, RDM "fail[ed] or refuse[d] to hire" him within the meaning of § 623(a)(1)); and (4) the circumstances were such that a reasonable person could draw an inference of age discrimination.[7] *Johnson v. McGraw-Hill Companies*, 451 F.Supp.2d 681, 694 (W.D.Pa. 2006). For purposes of summary judgment, RDM concedes that Santichen has established a prima facie case of age discrimination under the ADEA. Document No. 48, p. 3. Thus, there is no need for the Court to conduct an inquiry regarding the elements to his prima facie case.

Since Santichen's prima facie case has been established, the burden of production shifts to RDM to articulate a legitimate, nondiscriminatory reason for not hiring Santichen. *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093, 67 L.Ed.2d at 215. In *Burdine*, speaking through Justice Powell, the Supreme Court explained the nature of the burden placed on a defendant such as RDM:

---

[6] This determination moots the Water Authority's cross-claim against RDM. Document No. 27, p. 11.

[7] The Court states the fourth element broadly enough to encompass different circumstances in which an inference of age discrimination could reasonably be drawn. While some courts state the fourth element as requiring that the plaintiff show that he or she was treated differently than a *similarly situated, sufficiently younger* individual, such a showing is not required where there is other evidence which tends to support an allegation that age discrimination has occurred. These factors are relevant for their *evidentiary value* (or lack thereof) in creating an inference that age actually motivated (or did not motivate) the challenged decision. *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312-313, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433, 438-439 (1996). If the individual compared to the plaintiff is not similarly situated, or if he or she is not sufficiently younger than the plaintiff, the plaintiff can still satisfy the prima facie hurdle by presenting other circumstantial evidence that age actually motivated the employer's decision. *Fitzpatrick v. National Mobile Television*, 364 F.Supp.2d 483, 491-492, n. 4 (M.D.Pa. 2005).

The burden that shifts to the defendant, therefore, is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. The defendant need not persuade the court that it was actually motivated by the proffered reasons. See [*Board of Trustees of Keene State College v.*] *Sweeney*, [439 U.S. 24,] 25 (1978). It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. The explanation must be legally sufficient to justify a judgment for the defendant. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity. Placing this burden of production on the defendant thus serves simultaneously to meet the plaintiff's prima facie case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext. The sufficiency of the defendant's evidence should be evaluated by the extent to which it fulfills these functions.

*Burdine*, 450 U.S. at 254-256, 101 S.Ct. at 1094-1095, 67 L.Ed.2d at 216-217.

RDM stated in its position statement to the EEOC that it did not hire Santichen because of his alleged inappropriate conduct toward three different women between 2001 and 2003. Document No. 49, p. 12. Kerr cited the same reason in his deposition. Document No. 49, pp. 20-21; Document No. 56-2, pp. 36, 40. By stating this legitimate, non-discriminatory reason for its refusal to hire Santichen, RDM has met its burden of production, thereby rebutting the presumption of discrimination raised by Plaintiff's prima facie case.

Santichen must now "show by a preponderance of the evidence that [RDM's] explanation [for its actions] is pretextual (thus meeting his burden of persuasion)." *Fuentes*, 32 F.3d at 763 (citation omitted). Plaintiff does not have to prove that an "illegitimate" motive was the sole reason for RDM's decision; he need only prove that it was determinative, *i.e.*, "that but for the protected characteristic" the plaintiff would have received the thing he sought. *Fuentes*, 32 F.3d at 764 (citing *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993)); *see also Fasold v. Justice*, 409 F.3d 178, 183-84 (3d Cir. 2005) (citations omitted).

22

To defeat a motion for summary judgment at this point in the *McDonnell Douglas* analysis the "plaintiff must point to some evidence, direct or circumstantial, from which a factfinder *could* reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764 (citations omitted) (emphasis in original). Santichen need not "adduce evidence directly contradicting the defendant's proffered . . . explanations," but he must present enough evidence to "allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action." *Id.* (emphasis in original) (citations omitted). "[R]ejection of the defendant's proffered reasons" does not, however, compel judgment for the plaintiff, who at all times retains the "ultimate burden of persuasion." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407, 419 (1993) (citations omitted).

Santichen cannot survive summary judgment merely by showing that RDM was "wrong or mistaken"; whether RDM was "wise, shrewd, prudent, or competent" is not at issue. *Fuentes*, 32 F.3d at 765 (citing *Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 531, 533 (3d Cir. 1992); *Villanueva v. Wellesley Coll.*, 930 F.2d 124, 131 (1st Cir. 1991)). Instead, Santichen must either (1) "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [RDM's] proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence . . . and hence infer that the employer did not act for [the asserted] non-discriminatory reasons" or (2) "come forward with sufficient evidence from which a factfinder could reasonably conclude that an illegitimate factor more likely than not was a motivating or determinative cause of the adverse employment decision." *Id.* (internal citations and quotation marks omitted). Proof

23

in the second category includes a showing that the employer had previously discriminated against the plaintiff; that the employer treated similarly situated individuals who were not members of the protected class "more favorably"; or that the "employer [had] discriminated against other members of [the] protected class or other protected categories of persons." *Id.*; *see also Abrams v. Lightolier, Inc.*, 50 F.3d 1204, 1214 (3d Cir. 1995) (citing *Fuentes*, 32 F.3d at 765) (applying the *Fuentes* standards to an ADEA case).

As an initial matter, Santichen does not deny that there were incidents involving three women. The first occurred in 2001. Document No. 52-2, p. 19. Santichen explained that, after he had changed the meter at a residence, he returned to that residence again. *Id.* It is not clear to the Court why he did so. A man living at the home apparently viewed Santichen's return as an "advance" toward his wife, and complained to Laurel personnel about Santichen's conduct. *Id.* No formal disciplinary actions were taken against Santichen on that occasion. *Id.*, p. 20.

According to Santichen, the second incident occurred when he pounded on the door of a residence to inform its occupants that he had finished a job. *Id.* He apparently did this to inform a woman inside the residence that she could park her car nearby. *Id.*, p. 22. Santichen's boss instructed him to carry the woman's laundry basket to her car. *Id.* The woman allegedly told Santichen that she was "single," and that she wanted to talk with him at lunchtime. *Id.* The boyfriend of the woman thought that Santichen was "hitting" on her. *Id.*, p. 20. Complaints were apparently voiced to Laurel personnel about Santichen's conduct, and Cvrkel gave him a "verbal warning" about the matter although Santichen received no formal discipline. *Id.*

Santichen also testified about a third incident involving a female janitor who worked for Safari, which was a subcontractor for Laurel. *Id.*, pp. 20-21. She accused him of "hitting" on her. *Id.*, p. 21.

24

Santichen wrote a letter of apology to the janitor, informing her that he would no longer work overtime. *Id.* She apparently worked during the evening, and Santichen indicated that he did not want to make her feel "uneasy" with his presence. *Id.* He gave his key to Laurel's building to his supervisor, claiming that he did not want to lose his job over the matter. *Id.* He testified that this incident resulted in him being suspended for one day without pay. *Id.*

Kerr testified that he decided not to hire Santichen precisely because Kukura and Felix had informed him about the allegations of sexual "harassment" described above.[8] Document No. 56-2, pp. 36, 40. Kerr further testified that he neither reviewed any of Laurel's personnel files, nor sought information beyond that provided by DiNicola, Kukura, Smith and Felix. *Id.* He apparently took what they had to say at "face value." *Id.*, p. 35. He had no obligation under the ADEA to do otherwise. *See Hazen Paper Co. v. Biggins*, 507 U.S. 604, 612, 113 S.Ct. 1701, 1707, 123 L.Ed.2d 338, 348 (1993) (citing and quoting *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 142-43, 111 S.Ct. 478, 484-85, 112 L.Ed.2d 474 (1990)) (holding that even obviously discriminatory acts by an employer that are not based directly on the employee's age are not cognizable under the ADEA); *see also Fuentes*, 32 F.3d at 765 (holding that the only issue is an employer's discriminatory animus; whether the decisionmaker made a mistake or showed a lack of prudence is not relevant to a finding of discrimination).

Under certain circumstances discriminatory motives of a decisonmaker's subordinates, such as DiNicola, Kukura, Smith and Felix in the instant case, can be imputed to the decisionmaker. *See Caver v. City of Trenton*, 420 F.3d 243, 257 (3d Cir. 2005 (citations omitted); *Fuentes*, 32 F.3d at 766-67.

---

[8] Santichen complains that "[t]here is no direct evidence of what the managers though of Mr. Santichen other than what Mr. Kerr stated." Document No. 59 p. 3 ¶ 9; Document No. 58 p. 8 (calling the managers' statements "unsubstantiated hearsay"). Whether there is direct evidence of the content of the statements goes only to the weight of the evidence, an issue not before the Court at summary judgment. Any quotes by Kerr of the managers' statements go to his then -existing state of mind, which is the crux of the instant inquiry, and are therefore admissible pursuant to Fed. R. Evid. 803(3).

Such circumstances do not exist here. In the first place, regardless of the managers' motives in reporting the accusations of misconduct, Santichen himself admits that the incidents took place. Moreover, to the extent that the record indicates any sort of animus by any of the managers hired from Laurel, it indicates at most only that Felix did not like Santichen; that he made fun of Santichen's slowness on the job and poor vision; and that there was tension between the two men because Santichen would tell Felix that "Felix was doing [a job] wrong and [Felix] got mad" while Felix would make Santichen "do things that weren't professional." Document No. 49 pp. 40-41. There is nothing in the record to indicate that Felix claimed that Santichen's purported lack of ability was due to his age, or that what appears to have been purely personal animus was grounded even in part by Felix's aversion to people over the age of 40.

Santichen attempts to show pretext by claiming that the people hired by RDM shortly after it assumed operations of the Water Authority "were all under the age of forty (40) with little for [sic] no experience and hired at less pay." Document No. 58 p.9. To the extent that he suggests that he was not hired so that someone younger could be hired more cheaply, he states an action that does not implicate the ADEA. *See Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1125-26 (7th Cir. 1994) (noting that the Seventh Circuit's holding in *Metz v. Transit Mix, Inc.*, 828 F.2d 1202 (7th Cir. 1987) that firing an employee so he could be replaced by a younger and lower-paid employee was age discrimination had been overruled by *Hazen*, 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338); *see also Hazen*, 507 U.S. at 610-13, 113 S.Ct. at 1706-08, 123 L.Ed.2d at 346-49 (holding that "the very essence of age discrimination" is that an employer assumes that "productivity and competence decline with old age," and that tangential issues such as seniority and its related perks do not come within the ambit of the protections afforded by the ADEA).

Santichen also attempts to show that Kerr gave him numerous pretextual reasons for RDM's failure to hire him. Document No. 58 p. 8. They included claims that "his work was good enough [but] there was not enough room and not enough money" and Santichen was "not versatile enough and did not work enough overtime." *Id.* (citing "App pg 54a").[9] Santichen also claims that at deposition RDM "stated they did not have room for him and cited his past behavior as reason for non hire." *Id.* (citing App pg 54a). However, App p 54a is part of the deposition of Paul Vrabel, App. pg. 47a-58a; so far as the Court can determine, Santichen is not mentioned once in these pages.[10] Looking at Santichen's actual testimony, the Court notes that the only reason Santichen actually claims Kerr gave him for not hiring him was "financial restraints." Document No. 56-3 p. 22. Santichen also claims that Kerr told him that he "would be the next one hired," so long as "somebody went with Laurel instead of going with RDM, if they retired, early retirement or if they became disabled, someway of opening up that." Document No. 49 p. 41. Kerr, however, testified that after conferring with the managers hired from Laurel "there was no position for which [RCM] would have considered" Santichen. Document No. 49 pp 23-24.

Apart from the averments cited above, Santichen's testimony generally undermines his claim. As previously discussed, he has admitted to the three incidents of alleged harassment. He has also bluntly stated that he "really believe[s] that [he] was not hired by RDM due to them hiring Mr. Felix and his regard for [Santichen's] job superiority." Document No. 49 p. 40. He has also testified that at least some of the hiring that has taken place since RDM assumed management of the Water Authority

---

[9] So far as the Court can determine, App pg 54a is Document No. 56-3 p. 14.

[10] Santichen also cites App. pg. 20a, 21a, 22a for the proposition that "RDM based its decision not to hire Mr. Santichen on unsubstantiated hearsay." Document No. 58, p. 8. The Court has discussed the hearsay issue in n. 9, *supra*; here it only notes that the cited pages pertain, respectively, to Martin Vrabel, Paul Vrabel, and the cover page of Kerr's deposition transcript.

is due to nepotism. *See id.* at 36, 42. In addition, his statements that RDM wanted to hire less expensive workers tend to support RDM's alleged claim of "financial restraints." None of these reasons is directly related to Santichen's age; at base, he can only argue that the fact that he was allegedly given one reason for his not being hired, while RDM has asserted a different reason starting with its response to Santichen's EEOC complaint, proves that RDM's stated reason is a *post hoc* fabrication.

The Third Circuit has never, so far as the Court can determine, directly addressed an employer's duty to honestly describe its reasons for an employment decisions to its subject. The Sixth Circuit has. In a discriminatory firing case the court held that so long as there was ample evidence that the proffered reason existed prior to the employment action, the fact that the reason given the employee for his termination was not the reason advanced by the employer in the subsequent litigation was not sufficient, without more, for the employee's claim to survive summary judgment. *Abdulnour v. Campbell Soup Supply Co., LLC*, 502 F.3d 496, 502-03 (6th Cir. 2007); *see also Lynch v. Robertson*, 2007 WL 2407276, at *13, 2007 U.S. Dist. LEXIS 60835, at *37-41 (W.D.Pa. August 20, 2007) (recognizing that the communications between employers and prospective employees are often lacking in the candor that individuals commonly expect to be present in ordinary circumstances).

## VI. CONCLUSION

The record evidence is insufficient to enable a reasonable trier of fact to conclude that Santichen was an employee (or a prospective employee) of the Water Authority. Even if the Water Authority had been Santichen's employer (or prospective employer), the Water Authority would nevertheless be entitled to summary judgment on the alternative ground that Santichen has failed to produce evidence that RDM's decision not to hire him constituted a violation of the ADEA. Consequently, the Court

28

must grant the Water Authority's Motion for Summary Judgment. Document No. 50. Since no reasonable jury could conclude, based on the evidence of record, that RDM failed or refused to hire Santichen because of his age, the Court must also grant RDM's Motion for Summary Judgment. Document No. 46. Accordingly, the Court will grant both Motions for Summary Judgment pending in this case. An appropriate order follows.

## ORDER

**AND NOW**, this 31st day of March, 2008, this matter coming before the Court on Defendant RDM-Johnstown's Motion for Summary Judgment ,(Document No. 46), and Defendant Greater Johnstown Water Authority's Motion for Summary Judgment, (Document No. 50), it is **HEREBY ORDERED** that both Motions for Summary Judgment are **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant Greater Johnstown Water Authority's Cross-Claim Against Co-Defendant RDM-Johnstown, LLC, (Document No. 27 p. 11), is hereby **DISMISSED** as moot.

**BY THE COURT:**

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**

cc:     Jerome J. Kaharick, Esq.
        Ronald P. Carnevali, Jr., Esq.
        Robert J. Grimm, Esq.
        Daniel B. Pagliari, Esq.

29